on behalf of the Gomez family, I would like to reserve five minutes of my time for a rebuttal. This case is a case that involves foreign law, particularly the elements of what it takes to make a marriage in the Philippines. Elements, they are called requisites under the law in the Philippines. They are found in Article 80 as set forth in Matter of Augustine. In this case, our position is there was lacking a solemnization of the marriage. There were no vows. There was a lack of a marriage license, and there was a lack of a signature at the time of the event in 1986. In the Philippines, there's a concept of void marriage and voidable marriage. In this case, because of the omissions and the requisites of marriage that I just named, this marriage was void ab initio from the beginning. Well, we know those things because it was later nullified. Is that a null? No, Your Honor. We know those things. How do we know all those things? We know those things because the Philippine Regional Trial Court made those findings a law was not complied with, and therefore, there was no marriage that took place. When did they make those findings? 2010, yes. And that was when they declared that the marriage was nullified? Well, the findings of fact were made, and their finding was that no marriage took place. No marriage took place. Right. It's not a voidable marriage that they just voided in 2010. They made a finding that it was void in the beginning because of those omissions of requisites. They were not present. So it differs from an annulment. Our position is that it differs from an annulment. Who were the witnesses before the Philippine Court? In the Philippine Court order from 2010, I don't have the witness names in front of me, but the Philippine Court order is part of the record from 2010, and that's the subject of this case. My point is it was one-sided. It was provided by, that information was provided by your client after the fact, correct? Well, I was not present. She had a lawyer there, and there were findings made in the court, in the regional trial court in the place where this allegedly occurred. It was in Maduro, Philippines. Right. Yes, and the way the judgment reads, there was confirmation that the marriage license was in a 1997 file instead of a 1986 record. Therefore, it was not obtained in 1986. The couple was together during the intervening, what, 27 years? Eleven years, yes. Yes, they were. And those proceedings in the Philippines in 2010 were instituted after immigration proceedings had begun here? Yes, yes, they were. If you look at the matter of Augustine, there the Board of Immigration Appeals found that testimony alone about a lack of a marriage license was not sufficient. So a court order is something that would bring clarity and resolve any insufficiency of evidence. And when I looked at the marriage contract and saw it was registered late, I had questions, and then the answers to those questions resulted in advice that a lawyer in the Philippines should bring an action and have this matter decided because it appears to me, my reading of the Philippine law, you were not married at that time because those requisites did not happen. They weren't as defective. They were omitted. And therefore, there was never a marriage that took place in 1986. The judge treated the Philippine declaratory order as an annulment. She used the word, the marriage was later voided, and the Board of Immigration Appeals in its decision said, apparently, the Gomez family satisfied the objective requirements to have the marriage invalidated. And our position is that's not accurate. It was already void. It did not need a declaration or a court order to void it. In fact, the Philippine Code, on the record, page 80 of the record of 718 total pages, it says that a judicial declaration is not needed. So considering those facts, our position is that the Philippine court order should be recognized, and it was not in this case. There's no allegation of fraud by the government against the Philippine court order. So unless and until there's something that is brought forth to be a reason not to give it recognition in our court, it should be recognized. It seems to me that taking your argument about what the BIA has done in its published cases in the past, the defect here isn't even as to the ultimate merits, because it appears to me that the BIA here did not examine itself the requirements of Philippine law at the time of the purported marriage. And if that's a correct reading of what they've done and of their past cases, wouldn't we just have to send it back to the BIA for reconsideration so that they, in the first instance, can examine the requirements of Philippine law and whether the person was married? That's basically what they did in, I've forgotten the name of it already. Augustine and Dela Cruz both, I think, involved the BIA itself saying, okay, you were married in the Philippines, and these were the requirements, and you met them or you didn't meet them. And they haven't done that here, so how can we possibly do that ourselves if they haven't done it? Well, Your Honors can read the content of the Philippine court order. No, our job is to read what the BIA did and determine whether it was, you know, appropriate or not under our standards. And if they did not do the correct analysis, we can't do it for them. The Supreme Court has told us that quite a few times. And so they have never passed on the issues that you're talking about, what are the requirements. And they may say, well, we agree with what this court did, or they may say, no, no, we have other information. So why wouldn't we just send it back for them to do that job? Well, I agree with you that they do not seem to have examined it. There's nothing in the record that shows that they did. I quoted the sentence from the board's decision that says that apparently the Gomez family met the objective requirements to have the marriage invalidated. So if that is the proper course to send it back, I certainly would be open to that, because I don't believe the immigration judge nor the BIA really did look at the Philippine law. No, that's exactly my point. They just looked at it afterwards and talked about their incentives to deal with it late in the game and so on and so forth. But they've not done at all the sort of analysis that was done in those earlier cases. Yes, Judge, well, I would be happy if this honorable court would make that determination. You'd be happy to send it back and have them look. Yes, Judge. What do we do with the fact that she was apparently in an affidavit in 1999 where she said that she had been married in 1986? Are you referring, Your Honor, to the affidavit in connection with registering the marriage slate? Yes. Well, what I can say is that the Philippine court order makes an inconsistent finding with what is the content of that affidavit, especially with regard to the lack of a marriage license and the fact that it is in the different year file. It's not in the 1986 file. So that alone is an inconsistency to the regional trial court, I think has superior knowledge and effect than her Mrs. Gomez declaration. I cannot say anything else. I would have to go off the record and that wouldn't be proper. Okay. You advised the retention of counsel in the Philippines, is that correct? Yes, yes. After you were hired in the case? Yes. I saw what I believe my reading of the law based on the facts as they were told to me, which are consistent with the Philippine regional trial court order, that I don't believe there was ever a marriage. That's the key to the case. At the time in 1986, was there a marriage? And I don't believe there was. I'll reserve the rest of my time. Thank you. You may do that. Good morning. May it please the court, this is Dana Camilleri for the Attorney General. The instant case turns on a single issue, whether the agency declined properly to retroactively apply Gomez's 2010 annulment in order for her to reap the benefits of a 1994 visa petition. Slow down. Sorry. The question, you're recasting the question as one of retroactivity, but isn't there an obligation on the part of the BIA to determine whether at the time of entry she was a married person? And just an independent obligation to figure that out with whatever evidence may be available. So if she testified here to all the same things she testified to in the Philippines, the BIA could make a determination that it is or is not a valid marriage. So why is it a retroactivity problem? Because that is what the dispositive case law, including this court's case law, says. Additionally, in terms of the matter of Augustine, the reason they looked at it, I'm sorry, Your Honor. Well, no, that's, there can't be a retroactive application of the holding per se, but the question is whether the BIA has an independent obligation to figure out if, in fact, she was married in whatever the year was, now I've forgotten, 1986, whatever the year was when she entered. So regardless of how the BIA analyzes that, don't they have to just do that independently? That's not what the case law says. If you're referring to the matter of Augustine, there was no annulment order in that case, but all the other cases where there were void ab initio under Philippines law, including Hendrix, and actually a very recent unpublished case where Petitioner's Counsel made these exact arguments and a panel rejected them, Sustol, which was about four years ago. They don't need to look at the underlying facts of the marriage. They don't need to look at the actual underlying Philippines decision. They just need to determine whether they want a retroactive reappliance. Right, but Hendrix says it is the marital status at the time of entry that should serve as the basis for one alien's preferment over others under the quota system and at the time the petitioner entered, so on. So the focus has to be at that time, and so is there a difference between Hendrix and this case because they didn't look independently at that? Our position is no, there's no difference. She was married in 1994. There's a lot of back and forth about whether they had been filed, but they were living as a married couple in 1997. She attested to the fact that they had been married since 1986. They had been filing joint tax returns to the United States. She acknowledges, I believe in 1999, in a subsequent visa application, that she has been married this entire time. It's not until the notice of intent to deny that suddenly, oh, we're not married, we're going to go back to the Philippines court in a non-adversarial proceeding and sever and try to game the immigration system, and that's where Hendrix, Wong, and the other dispositive case law comes in and tells us that the BIA does not have to give retroactive effect to this Philippines judgment because it's a blatant attempt at gaming the immigration system. So you're, in effect, saying that the BIA did, and the IJ did, look to whether she was married at the time? I believe in the decision for reconsideration they discussed those underlying facts at length. If there are no more questions, I'll rest on the briefs. I would just like to say that the government council is focusing heavily on the behavior of the Gomez as a couple, and their behavior does not necessarily indicate whether or not a legal marriage was entered into, and I would request that the judges and the BIA look at the law in the Philippines and then look at the facts, and if they need another hearing for more fact-finding, that would be well with us. Because the law in the Philippines is very clear, and if certain requisites are not met, then there is no marriage. And I believe in this case there is enough evidence to show the BIA did not articulate clearly that they had considered the Philippine law applicable to this case. Thank you, counsel.
judges: Schroeder, Graber, Watson